IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| KATHARINA HARPER | § | |
| | § | |
| V. | § | A-10-CV-631-LY |
| | § | |
| CALDWELL COUNTY | § | |

**ORDER**

Before the Court are Plaintiff's Motion for Spoliation Sanctions (Clerk's Docket No. 33), Defendant's Response (Clerk's Docket No. 47), Plaintiff's Reply (Clerk's Docket No. 51), Plaintiff's Notice of Filing, (Clerk's Doc. No. 53), and Defendant's Advisory to the Court (Clerk's Doc. No. 56). The undersigned held a hearing on the matter on March 28, 2012. At the hearing, the Court announced that it would issue an order prior to the parties' final pretrial conference set for March 30, 2012, at 11:00 am, so that the parties could prepare for trial accordingly. With this goal in mind, the Court issues this order to address the motion at least to the extent it might impact the evidence at trial. A memorandum opinion setting forth the Court's complete ruling, and addressing the motion in detail with be forthcoming in the near future.

In brief, the motion argues that the County failed to preserve a surveillance video of an incident that took place in the jail control room during the early morning hours of May 3, 2009. Harper contends that the County's failure to preserve the video amounts to bad faith spoliation of evidence, warranting the administration of an "adverse inference" instruction at the trial of this case.[1] The County responds that the evidence was in fact not preserved, but that all of the officers who viewed the video have testified that, because the camera was located behind the two officers in the

---

[1] Presumably, the instruction would direct the jury that the County's failure to preserve the video evidence allows the jury to assume that the video would have corroborated Harper's description of the events that took place in the control room on the night in question.

control room, it was inconclusive with regard to the type of touching that took place between the officers, and that regardless of what the video depicted, it is irrelevant to the claims raised by Harper in this suit. The County further argues that its failure to preserve the tape was not done in bad faith, but rather was at most an act of negligence.

In the Fifth Circuit, an adverse inference instruction is viewed as a "severe sanction" that is only warranted when the party seeking sanctions demonstrates that the failure to preserve the evidence was committed in bad faith. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 614 (S.D. Tex. 2010) (citations omitted). In an unpublished decision, the circuit stated that "'[m]ere negligence is not enough' to warrant an instruction on spoliation." *Russell v. Univ. of Tex. of Permian Basin*, 234 Fed. Appx. 195, 208 (5th Cir. 2007 (unpublished) (quoting *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).

With regard to whether the County acted in bad faith in this case, Harper contends that:

> Bad faith is apparent in this case. The testimony of Wes Horsley, Arthur Larivee and Keith Jeffrey indicates that copies of the surveillance tape were made. Sheriff Law claims that copies of the tape were never made. Either copies of the tape were made and then intentionally destroyed or the Defendant is improperly withholding copies of the surveillance tape. In either case, such conduct constitutes bad faith on the part of the Defendant.

Motion at 8, ¶ 19 (Clerk's Doc. No. 33) (record citations omitted). In fact, Lieutenant Larivee and Captain Jeffrey did not testify that copies of the video were made. Lieutenant Larivee's testimony indicated the he viewed the tape on the system itself:

Q   Did you see the surveillance video between Durocher and Rodriquez that Corporal Harper wrote them up about?

A   Yes, sir.

Q   Okay. And where did you see that?

> A    At that time, the only time that could be viewed was in the control room, is where the mainframe and monitor was.
>
> Q    And you saw it in the control room?
>
> A    I was in the control room when I viewed the video, yes sir.

Motion at Exh. F, pp. 70-71 (Clerk's Doc. No. 33-6). Captain Jeffrey's testimony even more specifically identified the video as having been recorded on the older looped-tape system:

> It's my understanding that Sergeant Horsley took over the investigation, talked with them, reviewed the—at that time we had a camera system that was just, kind of, a loop record system. And he had looked at the incident, and according to both employees that were allegedly groping each other, it looked like a back rub.

Motion at Exh. G, p. 40 (Clerk's Doc. No. 33-7). Finally, Sheriff Law's testimony was consistent with this:

> Q    Did you see that video?
>
> A    Yes, I did; yes, I did.
>
> Q    And you didn't think it was worthwhile to save it?
>
> A    No sir, I did not. I could not substantiate or discredit anything that was said by either party. We had to take them based on the face value of what they stated verbally.
>
> Q    Do you know how many other people saw that video?
>
> A    I would be guessing, but I believe that Mr. Horsley was present the date that I saw it and possibly Captain Jeffrey, but I'm not certain.
>
> Q    Was it shown to Officer Durocher and Officer Rodriquez?
>
> A    I don't believe so.
>
> Q    Do you know, did Ms. Harper see it?
>
> A    I don't believe so. I'm not certain. She may have before I got there. I know once it was brought to my knowledge, I was the only one that looked at it, as well as Mr. Jeffrey, I believe. Now, I'm doing this all from memory. It's been sometime, and I

>       don't recall. I answer that question without actually going back and looking at print, I was improving from the time I walked in the door to the time we're at now, to have a surveillance system in the facility to protect the employees that are working there.
>
>       But you start with square one. And at that time, we had some cameras there but they weren't the best—or had a looped recording system, if you will, like the old Sack-N-Pack. It would loop record and then record over itself.
>
> Q     Yes.
>
> A     So we had a period of time we could actually go in there and kind of view something that was there. And then we have since, hence, upgraded to where we now have some of the cameras with audio, and they are video, and some of them are color, and they're DVD-retrievable.
>
> Q     What was that cycle for the loop, to the best of your memory?
>
> A     I don't remember. I don't recall; I don't recall. I believe that question would probably be better answered by either Lieutenant Larivee or Captain Jeffrey.
>
> Q     What happened to the surveillance video of the Durocher/Rodriquez incident? Do you know?
>
> A     Like I said, that was a looped recording . . . .

Motion at Exh. H, pp. 37-38 (Clerk's Doc. No. 33-8).

The only witness who testified differently was Sergeant Horsley. His testimony is in two parts. First, on cross-examination by Harper's attorney, he stated:

> Q     Okay. And I know some of the other supervisors claim that they downloaded that tape on their computer.
>
>       MR. BASS:   Objection. Form.
>
> Q     (BY MR. PARKER)   Did you download yours?
>
> A     Did I download it?
>
> Q     Download the tape on your computer?
>
> A     No, sir.

> Q      Did you view it from your computer?
>
> A      I could transfer it to a USB. Like it was, whenever there was any incident, whether hands-on with inmates or what have you, the protocol was to download it. Usually you had to use like a USB drive or a blank DVD and burn it, and then you had to submit that with your report to the lieutenant.
>
> Q      Isn't that what you did?
>
> A      Yes, sir.
>
> Q      Okay. You know what happened to that USB or the DVD?
>
> A      The USB, I probably deleted it off of that, and then the DVD, I don't know what happens once they get them.
>
> Q      Okay. At least at the time you made your report, there was a USB and a DVD of the tape—
>
> A      Yes, sir.
>
> Q      —showing what happened in the control room. Is that correct?
>
> A      Yes, sir.
>
> Q      Okay. And you gave those to Lieutenant Larivee?
>
> A      I stuck them in his box. I didn't give them to him personally.
>
> Q      Yeah. Then what happened from there to them? You don't know?
>
> A      I have no recollection, sir.

Motion at Exh. B pp. 48-49 (Clerk's Doc. No. 33-2). But when questioned by the County's attorney, he equivocated:

> Q      Okay. All right. Now, earlier you said that you had – it was your recollection that you had downloaded the videotape of the control room. Could you tell me, did you actually – you said you did not find the incident until later in the shift. What do you recall from seeing on the video of the incident?
>
> A      That pretty much all you saw was Officer Durocher's back. You couldn't see Officer

> Rodriguez, and you just – you know, it could have gone either way, one way or the other. Like I said, all you saw was his back.
>
> Q   Now, during the time that you were at the SO, was there any change of equipment during that time –
>
> A   Yes, sir.
>
> Q   – in the recording equipment? Do you recall when that might have taken place?
>
> A   To be honest, I couldn't put a time. But by the time of this incident, we did have that new equipment, yes. Because we were finally able to look up and review things. Before that, it was just monitors, and you couldn't pull off anything.
>
> Q   What is your normal procedure when you attach documents or something like a tape to a report? Would you make reference to that in the report?
>
> A   Yes, sir.
>
> Q   Would you look at your report and see if there's any reference to a copy of the video being made.
>
> A   No, sir.
>
> Q   I guess what I'm asking is, are you sure you made a tape of this incident, a copy, to put in Larivee's box; or is that – do you have a distinct memory of that event?
>
> A   No, sir. All I can remember is reviewing the video and at least making an attempt to, but I don't remember – I can't recall if I was able to successfully do it or not.

Response at Exh5, pp. 62-63 (Clerk's Doc. No. 47-6). In short, four witnesses addressed whether a copy of the video was ever made, and which system the original would have been recorded on. Three stated that the recording was made on the jail's old system and not copied, and the fourth testified it was on the new system, but when asked specifically, was unable to recall for certain if that was correct. Further, he agreed that if he had appended a copy of the video to his report, his report would have noted as much, and it is undisputed that the report does not mention any video being attached.

6

The County also represented at the hearing that it had "turned the Sheriff's office upside down" in an attempt to find any copy of the video that might exist, and it has been unable to locate any copy. It is clear that it is not in the County's interest at this point in time to fail to turn over a copy if one existed. Thus, the Court rejects Harper's assertion that the County presently has a copy of the video and is refusing to produce it, as that is unsupported by any evidence.

Further, there is a legitimate question regarding whether the video is even relevant to Harper's claims. At the time of the incident, the video was being reviewed to establish whether two corrections officers had engaged in sexual misconduct, as reported by Harper. It was thus relevant to the investigation of whether these officers should be disciplined. and, at least at the time of these events, was *not* relevant to any investigation into any of Harper's actions. What got Harper into trouble was how she reacted to the investigation into the other officers' conduct. Harper was upset because she was excluded from the investigation, and she felt that the investigating officer should have accepted her description of the event without additional corroboration. Because she continued to complain about this up the chain of command from Sergeant to Lieutenant to Captain to Chief to the Sheriff himself, despite being told repeatedly that the issue of discipline imposed on others following a complaint was outside of her duties, she was eventually reprimanded herself, and then demoted, for insubordination. These actions ultimately led Harper to file her EEOC charge, contending that she had been retaliated against for making her report. But as the Sheriff explained during Harper's appeal to him, the County reprimanded and demoted Harper because it viewed her actions after the reported incident as insubordinate, not because of what did or did not happen in the control room between the two officers. Indeed, he made it clear that the County *accepted* her description of the events when it took action against those two employees. Hearing Exh. D-1 at 18,

45 lines 5-10.[2]

Given all of this, it was reasonable for the County not to view the video of the events in the control room as something relevant to Harper's claims of retaliation and discrimination, and thus reasonable for the County not to retain a copy of the video. At the same time, the decision not to retain a copy is subject to criticism, and may have been in violation of the County's own regulations. But the Court cannot conclude that the decision was made in bad faith, or with any bad intention to destroy evidence relevant to Harper's claim. Given this, even if the Court ultimately determines there was actionable spoliation warranting a sanction, it is clear that an adverse inference instruction would not be one of the sanctions the Court may consider. *Rimkus*, 688 F.Supp.2d at 614. Thus, the Court's final ruling on the Motion for Spoliation Sanctions will not in any way impact the evidence at the trial set for April 16, 2012. Whether any lesser sanction is warranted will be addressed in a later order.

SIGNED this 30th day of March, 2012.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

---

[2] "We reprimanded [the two employees] because your word as a supervisor at that point in time was gold to me. That's why you were put in that position. You saw something you said was inappropriate. You reported it. You did your job. That worked as far as I'm concerned. You said you witnessed it. I don't have any evidence whatsoever to support what you said, and there's two of them [denying it]. That's how powerful the supervisor's word is. . . . " *Id.* at 18 lines 13-20.